UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| OnSite Fleet, LLC, | ) |
| Plaintiff, | ) |
| | ) Case No. |
| v. | ) |
| | ) Jury Demand |
| NISSAN NORTH AMERICA, INC, | ) |
| Defendant. | ) |

## **COMPLAINT**

Plaintiff OnSite Fleet, LLC, ("OnSite"), by and through the undersigned counsel, files this Complaint against Defendant, Nissan North America, Inc. ("Nissan").

### **Parties, Jurisdiction & Venue**

1. OnSite is a Tennessee limited liability company, principally headquartered in Franklin, Williamson County, Tennessee.

2. Nissan is a Delaware corporation, principally headquartered in Franklin, Williamson County, Tennessee.

3. The Court has federal question jurisdiction over OnSite's claims against Nissan under 42 U.S.C. § 1981 ("Section 1981").

4. The Court has supplemental jurisdiction over OnSite's other claims against Nissan because they arise out of the same underlying facts as OnSite's Section 1981 claim.

5. The Court is the proper venue for OnSite's claims against Nissan because the parties are principally headquartered in this district and a substantial part of the actions underlying OnSite's claims occurred in this district.

### **Facts**

6. This case is about Nissan's unlawful (i) discrimination against OnSite's employees based on

race and (ii) termination of a contract with OnSite based on race and complaints of racial discrimination, which necessitated the termination of approximately 150 OnSite employees in seven states.

7. Effective April 2, 2018, OnSite entered into a written contract with Nissan to operate Nissan's Corporate Vehicle Lease Program ("CV Program"). The parties' original contract, as subsequently amended, is hereafter referred to as the "Professional Services Agreement."

8. For the benefit of Nissan employees, OnSite's services under the Professional Services Agreement included managing vehicle ordering, vehicle receipt, vehicle preparation, tracking, servicing, delivering, disposing and titling vehicles, accident and theft administration, and shuttle and transport services.

9. At the time of the events detailed in this Complaint, the Professional Services Agreement required OnSite to operate the CV Program at three Nissan facilities in Tennessee in the following locations: Smyrna, Decherd, and Franklin.

10. In addition to the three Nissan facilities in Tennessee, OnSite ran the CV Program at seven other Nissan facilities throughout the United States per the Professional Services Agreement.

11. OnSite employed Antwan McGlory, Jovan Mullins, Thomas Battle, and Willie Edmondson to perform tasks for the benefit of Nissan in the CV Program at its Smyrna, Tennessee facility.

12. McGlory, Mullins, Battle, and Edmondson are all African American (Black).

13. OnSite considered McGlory, Mullins, Battle, and Edmondson to be good employees with good performance as recognized by both OnSite and Nissan.

14. Mike Brown (White) was a Nissan management employee at all relevant times.

15. Trent Conrad (White) was the President of OnSite at all relevant times.

16. On August 17, 2021, Brown disagreed with OnSite's staffing decisions. Specifically, Brown

wanted to meet with OnSite employees to discuss staffing changes made by OnSite. OnSite rejected Brown's suggestion because OnSite was the actual employer of the OnSite employees and responsible for the day-to-day management of its employees, per the Professional Services Agreement.

17. On the following day (August 18, 2021), an OnSite employee named Kimberly Warren (White) submitted a written complaint against McGlory, Mullins, Battle, and Edmondson directly to Brown, not OnSite. Warren's complaint was unrelated to the Professional Services Agreement or the business between OnSite and Nissan.

18. Brown forwarded Warren's complaint to Conrad, Chris Back (OnSite's Director of Production), and Lauren Normand (OnSite's Director of Accounting and Administration).

19. Warren's complaint consisted of unfounded allegations that the four African American employees (who she referred to as "convicted felons") were "lazy and sat in the van all day." Also, Warren's complaint stated she was resigning because Edmondson only hired "one specific race" and never promoted her due to the "color of her skin."

20. After investigating Warren's complaint, OnSite found it to be without merit.

21. In September 2021, Brown asked an OnSite employee named Amanda McCabe (White) if she was interested in the Site Manager position at Smyrna. At that time, the position was not vacant as it was held by Edmondson.

22. Brown had no authority to solicit or hire anyone for OnSite's Site Manager position as he was an employee of Nissan, not OnSite.

23. On September 13, 2021, Nissan claimed that it received an "anonymous complaint" about McGlory, Mullins, Battle, and/or Edmondson to its hotline.

24. Nissan did not inform OnSite of the complaint or that it was investigating the complaint until

3

September 17, 2021.

25. On September 17, 2021, Brown informed OnSite via e-mail that McGlory, Mullins, Battle, and Edmondson were no longer permitted to enter Nissan property effective immediately because, in Nissan's opinion, they were not adequately performing contract services.

26. Conrad responded to the September 17th email asking for more information that supported Nissan's position.

27. On or about September 17, 2021, OnSite notified McGlory, Mullins, Battle, and Edmondson that they were no longer permitted on Nissan property, which made it impossible for them to perform their jobs. OnSite expressed its belief that McGlory, Mullins, Battle, and Edmondson were being railroaded—and likely discriminated against—by Nissan and Brown.

28. OnSite continued to employ and pay McGlory, Mullins, Battle, and Edmondson even though there was no work for them to do.

29. The Professional Services Agreement allowed Nissan to request a replacement employee if Nissan "reasonably determines that any personnel provided by Contractor are not adequately performing [s]ervices."

30. Nissan neither requested replacement employees nor explained how it reasonably determined that McGlory, Mullins, Battle, or Edmondson were not adequately performing services.

31. On September 23, 2021, Conrad sent a follow up email to Nissan concerning his request for information.

32. Conrad alerted Nissan that its actions rendered McGlory, Mullins, Battle, and Edmondson unable to work because they could not go into any Nissan facility.

33. Conrad expressed to Nissan serious concerns about its decision-making and the motivations for its actions against McGlory, Mullins, Battle, and Edmondson.

34. Conrad emphasized to Nissan that McGlory, Mullins, Battle, and Edmondson were all Black and that no White employees of OnSite had been prohibited from returning to Nissan facilities.

35. Conrad specifically pressed Nissan for information regarding its decision-making to "ensure that you, on Nissan's behalf, have not considered race in denying the access for these individuals."

36. Conrad reminded Nissan that its actions were contrary to protocols and agreements. Conrad alerted Nissan that "to the extent that you received complaints about OnSite Fleet employees, the proper protocol was to alert our management team and/or HR resource, in writing, with information about such complaints so that we could immediately investigate."

37. For several weeks, Nissan ignored Conrad's information requests. Nissan also ignored inquiries made by McGlory, Mullins, Battle, and Edmondson about its decision and the allegations against them.

38. OnSite then reached out to Carol Milner, Director of Facilities, Services and Support, Supplier Diversity at Nissan by email stating: "[T]hey have done nothing wrong and the situation is just getting worse." Conrad added, "I've been alerting Nissan to this issue for 3 weeks!!! If Nissan chose to ignore it – that's on Nissan – Not them."

39. Nissan eventually responded to Conrad's request for information on October 4, 2021, when Glenn Plosa of the Nissan Legal Department sent an e-mail stating: "On or about September 13, 2021, Nissan became aware of a complaint through its anonymous tip line alleging an unsafe and potentially dangerous workplace conditions."

40. Plosa, for the first time, stated that the allegations against McGlory, Mullins, Battle, and Edmondson included bringing "firearms and munitions on Nissan property" and Edmondson "yelling at OnSite employees."

41. The most serious complaint against McGlory, Mullins, Battle, and Edmondson accused them of "having guns and drugs" in Nissan's Smyrna facility.

42. Regarding the allegations of "having guns and drugs" in Nissan's Smyrna facility, Plosa's email indicated that those allegations were not substantiated by Nissan.

43. Regarding the other allegations, Plosa conveyed that Nissan's investigation only yielded evidence of: (1) alleged "hostility" during a discussion by Edmondson; and (2) "rude" behavior on the shuttle by the other three OnSite employees. Of the four OnSite employees in question, only McGlory was a shuttle van driver. Furthermore, McGlory's "rude" behavior was requesting Nissan employees to comply with Nissan COVID policies to socially distance on the van by sitting in the back rather than the front.

44. Nissan did not interview McGlory, Mullins, Battle, or Edmondson about the anonymous complaint or any other allegations as part of its investigation.

45. Nissan did not provide OnSite with its investigation documents, reports, recordings, or sources of information supporting its decision to revoke the four employees' facility access.

46. Nissan did not provide information about who conducted the investigation or decided to revoke facility access for the four employees.

47. OnSite also investigated the allegations, including by interviewing McGlory, Mullins, Battle and Edmondson, all of whom denied the allegations as preposterous and the product of race discrimination.

48. OnSite's investigation indicated that the allegations against McGlory, Mullins, Battle, and Edmondson were false.

49. OnSite found no evidence of safety violations, threats, or unprofessional conduct sufficient to warrant Nissan's revocation of facility access.

50. OnSite expressed concerns to Nissan that McGlory, Mullins, Battle, and Edmondson were being treated unfairly by Nissan based on race.

51. Nissan's shifting motives for revoking the four employees' facility access had no legitimate basis in fact and did not appear to be the actual reasons for that decision.

52. For more than two months, OnSite reached out to Nissan to plead on behalf of McGlory, Mullins, Battle, and Edmondson and ask Nissan to change its decision.

53. In November 2021, Nissan notified OnSite of its intent to terminate the portion of the Professional Services Agreement related to CV Program.

54. Prior to November 2021, Nissan never signaled any desire to terminate the CV Program. To the contrary, Nissan had sought ways to increase its business with OnSite both in the United States and internationally.

55. On December 1, 2021, Nissan provided OnSite with official notice of termination of the CV Program effective January 31, 2022. Nissan claimed that the contract termination was prompted by OnSite's misuse of login information related to vehicle safety inspections, an issue that OnSite had voluntarily disclosed to Nissan.

56. Nissan's proffered reason was not a legitimate basis for terminating the CV Program under the Professional Services Agreement.

57. Nissan's termination of the CV Program would result in elimination of approximately 150 employees' positions, including the positions held by McGlory, Mullins, Battle, and Edmondson.

58. Facing Nissan's revocation of facility access and impending termination of the CV Program, OnSite finally had to terminate the employment of McGlory, Mullins, Battle and Edmondson on December 15, 2021.

59. Nissan denied any responsibility for McGlory, Mullins, Battle, and Edmondson's terminations to both the EEOC and in subsequent litigation, invoking the provisions of the Professional Services Agreement that disclaim any joint employment.

60. In total, due to Nissan's termination of the CV Program, OnSite was forced to terminate 150 employees in seven states.

## Count I – Violations of Section 1981

61. OnSite incorporates Paragraphs 1 through 60 of the Complaint by reference.

62. This is a claim for discrimination and retaliation in violation of Section 1981.

63. OnSite and Nissan were parties to a contract, the Professional Services Agreement.

64. While the parties were performing under the Professional Services Agreement, Nissan discriminated against OnSite's employees—McGlory, Mullins, Battle, and Edmonson—based on race (Black) by revoking their facility access and effectively forcing OnSite to terminate their employment.

65. Moreover, while the parties were performing under the Professional Services Agreement, OnSite repeatedly complained that Nissan's allegations against those four employees, investigation of the allegations against them, and decision to revoke their facility access and effectively terminate their employment with OnSite were all based on their race (Black).

66. In retaliation for OnSite's complaints that those four employees were being discriminated against based on race (Black), Nissan terminated the CV Program.

67. As a result of Nissan's actions in violation of Section 1981, OnSite has been and continues to be damaged, including by, without limitation, the loss of approximately $14 million in annual revenue from the CV Program.

68. Nissan's actions in violation of Section 1981 were undertaken with malice or reckless

8

indifference to the federally protected rights of OnSite and its employees.

## Count II – Breach of Contract

69. OnSite incorporates Paragraphs 1 through 60 of the Complaint by reference.

70. This is a claim for breach of contract under Tennessee law.

71. The Professional Services Agreement is an enforceable contract between the parties under Tennessee law.

72. In addition to the express terms of the Professional Services Agreement, the parties' performance of the contract was governed by an implied covenant of good faith and fair dealing.

73. Nissan breached the Professional Services Agreement—including, without limitation, its implied covenant of good faith and fair dealing—by revoking McGlory, Mullins, Battle, and Edmondson's facility access and effectively terminating their employment with OnSite without a reasonable determination that they were not adequately performing services.

74. Nissan breached the Professional Services Agreement—including, without limitation, its implied covenant of good faith and fair dealing—by revoking those four employees' facility access and effectively terminating their employment with OnSite based on race (Black).

75. Nissan breached the Professional Services Agreement—including, without limitation, its implied covenant of good faith and fair dealing—by terminating the CV Program in retaliation for OnSite's complaints that those four employees were being subjected to discrimination based on race (Black).

76. As a result of Nissan's breaches of the Professional Services Agreement, OnSite has been and continues to be damaged.

77. Nissan breached the Professional Services Agreement intentionally, maliciously, and/or

9

recklessly.

## Count III – Tortious Interference with Employment Relationships

78. OnSite incorporates Paragraphs 1 through 60 of the Complaint by reference.

79. This is a claim for tortious interference with employment relationships under Tennessee law.

80. Nissan was aware that OnSite had existing employment relationships with McGlory, Mullins, Battle, and Edmondson.

81. Nissan intentionally caused the termination of OnSite's employment relationships with those four employees by revoking their facility access in breach of the Professional Services Agreement and based on their race (Black).

82. As a result of Nissan's tortious interference with OnSite's employment relationships with those four employees, OnSite has been and continues to be damaged.

83. Nissan's tortious interference with OnSite's employment relationships with those four employees was intentional, malicious, and/or reckless.

## Request for Relief

OnSite asks the Court to enter judgment against Nissan with respect to all claims presented in this Complaint and award OnSite all compensatory damages, punitive damages, reasonable attorney's fees, costs, pre and post-judgment interest, and other relief available under applicable law.

## Jury Demand

OnSite demands a trial by jury of all claims presented in this Complaint.

Respectfully submitted,

/s/Daniel Crowell
Leslie Goff Sanders (TN #18973)
Daniel Crowell (TN #31485)
Stephen Stovall (TN #37002)
BARTON LLP
611 Commerce Street
Suite 2603
Nashville, TN 37203
Telephone: (615) 340-6790
lsanders@bartonesq.com
dcrowell@bartonesq.com
sstovall@bartonesq.com

*Attorneys for Plaintiff*